UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NEUROPTICS, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 1:19-cv-04832-JMS-MG |
| BRIGHTLAMP, INC., | ) | |
| | ) | |
| *Defendant*. | ) | |

**ORDER**

Plaintiff NeurOptics, Inc. ("NeurOptics") and Defendant Brightlamp, Inc. ("Brightlamp") both manufacture and sell pupillometers[1] and related products. NeurOptics brought this action, alleging patent infringement in connection with Brightlamp's "Reflex" Mobile Pupillometer Application ("Reflex"). [Filing No. 1.] Brightlamp denied infringement and filed counterclaims alleging that NeurOptics' patents identified in the Complaint were not infringed, are invalid, and are unenforceable, and that NeurOptics had engaged in "antitrust activities" in violation of the Sherman Act. [Filing No. 48-1.] The parties attempted to reach a settlement, resulting in a telephone conversation and subsequent email exchange between NeurOptics' and Brightlamp's CEOs. Brightlamp now takes the position that the email exchange culminated in a valid and enforceable settlement agreement and moves to dismiss this action on that basis, but NeurOptics disagrees. Brightlamp's Renewed Motion to Enforce Settlement Agreement and Dismiss this Action, [Filing No. 69], is fully briefed and ripe for the Court's decision.

---

[1] "Pupillometer" can also be spelled "pupilometer," and refers to a device used to measure the pupil. *See Pupillometer*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/154783?redirectedFrom=pupillometer#eid (last visited Sept. 16, 2021). To the extent the parties did so in their correspondence quoted in this Order, the Court utilizes both spellings interchangeably.

1

# I.
## BACKGROUND

On March 27, 2019, NeurOptics' counsel, Nathaniel Dilger, sent a demand letter to Brightlamp's CEO, Kurtis Sluss. [Filing No. 70-1 at 5-13.] The letter stated that NeurOptics "holds an extensive and wide-reaching intellectual property portfolio that is focused on protecting all aspects of NeurOptics' pupillometer technology," asserted that Brightlamp's Reflex application "infringe[d] multiple NeurOptics patents," and declared that a patent recently issued to Brightlamp was "unpatentable and invalid in view of NeurOptics' own patent portfolio and must therefore be dedicated to the public." [Filing No. 70-1 at 5.] In the letter, Mr. Dilger repeatedly referenced NeurOptics' "patent portfolio." [Filing No. 70-1 at 5 ("NeurOptics has for many years developed an extensive patent portfolio protecting its pupillometer technology."); Filing No. 70-1 at 7 ("Despite the breadth and coverage of the NeurOptics' patent portfolio, Brightlamp has announced plans to introduce its own mobile pupillometer, known as 'Reflex.'"); Filing No. 70-1 at 10 ("Because Brightlamp knew of both NeurOptics and its extensive patent portfolio, NeurOptics believe[s] this infringement was both willful and deliberate . . . ."); Filing No. 70-1 at 11 ("Notably, NeurOptics' patent portfolio predates [Brightlamp's patent] by nearly two decades.").] The letter identified 22 specific patents held by NeurOptics that it believed were infringed by the Reflex application, but explicitly stated that NeurOptics believed other patents not specifically listed had also been infringed. [Filing No. 70-1 at 5-6; Filing No. 70-1 at 10 ("The discussion above is only exemplary and is not intended to be an exhaustive explanation of the patents or claims infringed by Brightlamp's Reflex product. NeurOptics in fact believes that the Reflex product unquestionably infringes . . . additional claims from additional NeurOptics patents.").]

The demand letter did not lead to a resolution of NeurOptics' allegations, and on December 6, 2019, NeurOptics filed its Complaint. [Filing No. 1.] The Complaint alleges that Brightlamp infringed "at least U.S. Patent No. 6,820,979 (the "'979 Patent") and U.S. Pat[ent] No. 9,402,542 ([the] "'542 Patent") (collectively, the 'Asserted Patents.')." [Filing No. 1 at 1.] The Complaint further stated: "NeurOptics in fact believes that the Reflex pupillometer . . . may have infringed various claims from additional NeurOptics patents, including potentially [five other enumerated patents]. As NeurOptics completes its investigation, it expects to amend this complaint to identify any additional infringed patents." [Filing No. 1 at 7.] NeurOptics never filed an amended complaint.

On May 15, 2020, Mr. Dilger presented NeurOptics' settlement demand to Brightlamp's counsel. [Filing No. 70-3 at 2-3.] The demand contained the following proposed terms:

1. For a period of 6 years, Brightlamp will agree to neither market nor knowingly offer for sale or sell its accused pupilometer application to hospitals or licensed medical professionals.
2. Brightlamp will pay NeurOptics $7,5000 (sic)
3. In return for the above, NeurOptics will covenant not to sue Brightlamp on NeurOptic's (sic) pupillometer patent portfolio, subject to the field of use restriction above.
4. The parties will dismiss with prejudice all claims and counterclaims, with each side bearing its own costs and fees.

[Filing No. 70-3 at 3.]

On July 22, 2020, Mr. Sluss, Brightlamp's CEO, and William (Bill) Worthen, NeurOptics' CEO, discussed this litigation via telephone. [Filing No. 70-1 at 2; *see also* Filing No. 72-5 at 6.] Following the telephone conversation, Mr. Worthen sent an email to Mr. Sluss, thanking him for the call and proposing "a potential business solution." [Filing No. 72-5 at 6-7.] Specifically, Mr. Worthen proposed the following terms:

3

> 1. For a period of 4 years, Brightlamp will agree to neither market nor knowingly offer for sale or sell its accused pupilometer application to hospitals.
> 2. In return for the above, NeurOptics will (a) forego its claim for damages and (b) covenant not to sue Brightlamp on NeurOptic's (sic) pupillometer patent portfolio, subject to the field of use restriction above.
> 3. Both parties will dismiss with prejudice all claims and counterclaims, with each side bearing its own costs and fees.

[Filing No. 72-5 at 6.]

Mr. Sluss responded via email, stating, in relevant part:

> I propose the following settlement to mitigate unnecessary expenditure from your side and, as you put it in our call earlier today, to get this suit over with and put it to bed.
>
> 1. Brightlamp will agree to neither market to hospitals nor knowingly offer for sale or sell its accused pupilometer application to hospitals, up to the expiration of the patents-in-suit (i.e. August 1, 2021).
> 2. Brightlamp to pay NeurOptics $5,000
> 3. In return for the above, NeurOptics will (a) forego its claim for damages and (b) covenant not to sue Brightlamp on NeurOptics' pupillometer patent portfolio, subject to the field of use restriction above.
> 4. Both parties will dismiss with prejudice all claims and counterclaims, with each side bearing its own costs and fees.
>
> Please let me know if you accept the above settlement offer or if you would like to continue with court proceedings as scheduled.

[Filing No. 72-5 at 5-6.]

Mr. Sluss responded via email, suggesting that Brightlamp pay NeurOptics $2,500 rather than $5,000, but not making any other proposed changes. [Filing No. 72-5 at 4.] Mr. Worthen then responded, "$4k and we[']re done/good to go." [Filing No. 72-5 at 4.] Mr. Sluss replied: "Let's meet in the middle then between $1k and $5k. If you can agree to $3,000 then we can wrap this up." [Filing No. 72-5 at 3-4.] Mr. Worthen responded: "Ok." [Filing No. 72-5 at 3.]

Mr. Sluss then sent a final email on July 24, 2020, stating:

> Thanks, happy we can come to an arrangement. This is what I will be sending to my legal team as far as our agreed upon terms:

4

> 1. Brightlamp will agree to neither market to hospitals nor knowingly offer for sale or sell its accused pupilometer application to hospitals, up to the expiration of the patents-in-suit (i.e. August 1, 2021).
> 2. In return for the above, NeurOptics will (a) forego its claim for damages and (b) covenant not to sue Brightlamp on NeurOptics' pupillometer patent portfolio, subject to the field of use restriction above.
> 3. Brightlamp to pay NeurOptics $3,000.
> 4. Both parties will dismiss with prejudice all claims and counterclaims, with each side bearing its own costs and fees.
>
> Please let your side know as well so we can halt work on the hearing scheduled for Monday.

[Filing No. 72-5 at 3.]

On the same day, Mr. Worthen forwarded the email correspondence to Mr. Dilger and others, and Mr. Dilger in turn emailed Allan Sternstein and Norman Hedges, counsel for Brightlamp, suggesting that the parties notify the Court "that we've reached agreement and expect to be filing a notice of dismissal once we finalize the paperwork." [Filing No. 72-5 at 2.] Mr. Sternstein responded that he would "like to have the agreement finalized to make sure no disagreement arises" before notifying the Court. [Filing No. 72-5 at 2.] Nevertheless, later that same day, the Court was notified that a settlement had been reached in this action and issued an order directing NeurOptics' counsel to "file a motion to dismiss this cause and submit an order for the court's signature ordering the dismissal of this action or a stipulation of dismissal (consistent with the agreement of the parties)" within 30 days. [Filing No. 55.]

On August 5, 2020, Mr. Dilger sent Brightlamp's counsel a proposed draft settlement agreement. [Filing No. 70-5 at 2-9.] The draft was approximately 7 pages long and, in relevant part, contained a covenant not to sue stating that NeurOptics would release all claims "arising from or relating or attributable to (a) the NeurOptics Patents, or (b) the Litigation." [Filing No. 70-5 at 4.] "NeurOptics Patents" was defined as "the Asserted Patents and any and all Patents

5

existing or subsequently issuing from applications from which an Asserted Patent claims priority." [Filing No. 70-5 at 3.]

Mr. Hedges responded via email on August 6, 2020, attaching his own proposed settlement agreement and stating: "To assure the settlement is exactly as the parties agreed we suggest the agreement as attached to this email, which follows the specific language that was agreed [to] by the parties." [Filing No. 70-6 at 2.] The proposed draft contained three introductory paragraphs and recited the four numbered terms listed in the final email from Mr. Sluss to Mr. Worthen on July 24, 2020. [Filing No. 70-6 at 3.]

Mr. Dilger responded to Mr. Hedges via email, stating in relevant part:

> I have done this dozens of times. I expect you have as well. The parties negotiate the basic terms of the agreement, which they then finalize in a complete agreement. Your proposal to ignore common (and commonsense) practice and instead have a 4- line agreement that leaves numerous terms open – to put it mildly – strains credulity. In any event, it's unacceptable.

[Filing No. 70-7 at 2.] Mr. Hedges responded, stating that his proposed agreement was "exactly what was agreed [to] by the parties." [Filing No. 70-7 at 2.]

The parties then exchanged other drafts of a proposed settlement agreement. Relevant here, Brightlamp proposed that the covenant not to sue address claims "arising from or relating or attributable to (a) the NeurOptics Pupilometer Patent Portfolio, or (b) the Litigation," and that "NeurOptics Pupilometer Patent Portfolio" be defined as "any and all patents owned by NeurOptics as of the Effective Date [of the settlement agreement] that cover pupilometer products or components thereof, or the Accused Products." [Filing No. 72-4 at 2-3.]

The parties were unable to agree upon a finalized version of the agreement to be submitted to the Court, and NeurOptics' counsel did not file a motion to dismiss as ordered. On September 23, 2020, Brightlamp filed its first Motion to Enforce Settlement Agreement and

6

Dismiss this Action, asking the Court to order specific performance of the agreement reached between Mr. Sluss and Mr. Worthen and to dismiss this case. [Filing No. 56.] The Court denied the motion without prejudice in order to give the parties an opportunity to confer with the Magistrate Judge and attempt to reach an agreed resolution. [Filing No. 65.] When no such resolution was reached, Brightlamp filed the present Renewed Motion to Enforce Settlement Agreement and Dismiss This Action, [Filing No. 69], which is now ripe for the Court's decision.

## II.
### APPLICABLE LAW

A district court possesses the inherent or equitable power summarily to enforce an agreement to settle a case pending before it. *Wilson v. Wilson*, 46 F.3d 660, 664 (7th Cir. 1995). Whether a settlement agreement exists is a question of law, and whether to enforce the settlement agreement is a matter of the district court's discretion. *Beverly v. Abbott Labs*, 817 F.3d 328, 332 (7th Cir. 2016). "State contract law governs issues concerning the formation, construction, and enforcement of settlement agreements." *Id.*; *see also Pohl v. United Airlines, Inc.*, 213 F.3d 336, 338 (7th Cir. 2000) ("Issues regarding the formation, construction, and enforceability of a settlement agreement are governed by local contract law."). Accordingly, the Court will apply Indiana law to resolve Brightlamp's motion.

## III.
### DISCUSSION

Brightlamp argues that the email exchange between Mr. Sluss and Mr. Worthen constitutes a binding and enforceable agreement under Indiana law. [Filing No. 70 at 8-10.] It further argues that the phrase "NeurOptics' pupillometer patent portfolio" as used in the email agreement is not ambiguous, because each of those words are common and understandable terms. [Filing No. 70 at 10.] Specifically, Brightlamp asserts that "'portfolio' is a well known

7

term for the products or assets in someone's arsenal." [Filing No. 70 at 10.] According to Brightlamp, the email agreement represents a meeting of the minds because the language relating to NeurOptics' patent portfolio—which was drafted by NeurOptics' counsel in the initial settlement demand—has never been limited to only specific patents and NeurOptics' "previously undisclosed view of what was agreed upon cannot now trigger an ambiguity or the lack of a meeting of the minds and vitiate the settlement agreement that was made." [Filing No. 70 at 11-12.] Brightlamp argues that the parties' outward manifestation of their intent is what matters, not their subjective or secret intentions. [Filing No. 70 at 12-13.] Finally, Brightlamp contends that it is appropriate for the Court to order specific performance of the email agreement and dismiss this case because a valid and enforceable contract exists, it is ready and willing to perform its obligations under the contract, NeurOptics has refused to perform its obligations, and no adequate remedy at law exists. [Filing No. 70 at 14-15.]

NeurOptics responds that "[t]here is no agreement here for the Court to enforce." [Filing No. 72 at 1.] Specifically, NeurOptics asserts that there was no meeting of the minds because "the parties had dramatically differing views of what patents Plaintiff NeurOptics would be including in its proposed covenant not to sue," and NeurOptics "was only offering to covenant on the Asserted Patents and all other related patents in the same patent 'family.'" [Filing No. 72 at 1.] Citing to the proposed draft settlement agreements exchanged by the parties and to Mr. Worthen's declaration, NeurOptics argues that there was never any agreement as to which patents would be covered by the covenant not to sue and each party had a different understanding of the covenant's meaning. [Filing No. 72 at 2-3.] NeurOptics argues that Brightlamp's current position that the covenant applies to all patents in NeurOptics' arsenal is different—and even more unreasonable—than its' previous position taken in a proposed settlement draft that the

8

covenant applied to "any and all patents owned by NeurOptics as of the Effective Date that cover pupilometer products or components thereof, or the Accused Products." [Filing No. 72 at 3-4.] NeurOptics argues that all of this confusion shows that no meeting of the minds was ever reached, and only its view of the covenant "comports with the reality of this litigation" because "[n]o reasonable person" would have ever accepted a nominal payment and a limited exclusion (hospitals only) that would apply only until August 2021 in exchange for a broad covenant not to sue on any of NeurOptics' many patents, including those having nothing to do with this litigation. [Filing No. 72 at 4.]  NeurOptics maintains that the parties' various correspondence shows that all discussion was limited to patents related to this lawsuit, and that the parties did not believe that the emails between CEOs resulted in a final, enforceable agreement. [Filing No. 72 at 4-6.] In addition, NeurOptics argues that courts "universally refuse to enforce ambiguous settlement terms," and that the Court could not enforce the purported email agreement because there is "no 'fixed meaning, either linguistically or in industry practice,' to the phrase 'NeurOptics' pupillometer patent portfolio,'" and in fact the parties interpret that phrase differently. [Filing No. 72 at 6-7 (quoting *United States v. Orr Construction Company*, 560 F.2d 765 (7th Cir. 1977)).] NeurOptics asserts that because the phrase "NeurOptics' pupillometer patent portfolio" can be construed different in ways, it is ambiguous, and "Brightlamp's view of the settlement agreement would just lead to more litigation between the parties because of Brightlamp's adoption of an unreasonable definition of an ambiguous term," which is "the exact reason why the Seventh Circuit has refused to enforce agreements that include such major ambiguities." [Filing No. 72 at 8-9.]

In reply, Brightlamp argues that NeurOptics does not dispute that the email agreement contains an offer, acceptance, and consideration, and instead only disputes that there was no

9

meeting of the minds because the value of the consideration was inadequate. [Filing No. 73 at 4-5.] According to Brightlamp, NeurOptics' position that there was no meeting of the minds because the parties have different interpretations of the covenant not to sue is incorrect as a matter of law and the different interpretations NeurOptics point to are irrelevant because they arose only after an enforceable agreement had been reached. [Filing No. 73 at 5.] Brightlamp points out that there is correspondence predating the email agreement in which the parties discussed limiting the phrase "NeurOptics' pupillometer patent portfolio" to a family of seven patents, and in fact Mr. Dilger used similar language in his initial demand letter, which discussed over 20 different patents. [Filing No. 73 at 5-8.] Brightlamp reiterates that a party cannot rely on its undisclosed or secret intentions, and the Court must examine objective manifestations of the parties' intent. [Filing No. 73 at 9.] According to Brightlamp, "NeurOptics appears to be complaining that it made a bad deal," but that is not a basis for asserting that no agreement existed. [Filing No. 73 at 11.] Brightlamp distinguishes the cases on which NeurOptics relies, arguing that they differ factually and that they were decided under Illinois law, rather than Indiana law, which applies in this case. [Filing No. 73 at 12-17.]

"Indiana strongly favors settlement agreements and if a party agrees to settle a pending action, but then refuses to consummate his settlement agreement, the opposing party may obtain a judgment enforcing the agreement." *Sands v. Helen HCI, LLC*, 945 N.E.2d 176, 180 (Ind. Ct. App. 2011). Under Indiana law, "[t]he basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds of the contracting parties." *Conwell v. Gray Loon Outdoor Mktg. Grp., Inc*., 906 N.E.2d 805, 812-13 (Ind. 2009). An email exchange can form a binding contract if all of the necessary elements are present. *See Jetz Serv. Co., Inc. v. Ventures*, 165 N.E.3d 990, 995 (Ind. Ct. App. 2021) ("[The parties'] exchange of emails created a contract,

10

and the execution of a more elaborate written agreement to memorialize the contract was not required.").

"A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract." *Southard v. Keltner Prop. Grp., LLC*, 150 N.E.3d 256, 265 (Ind. Ct. App.), *trans. denied*, 160 N.E.3d 511 (Ind. 2020). "This meeting of the minds must extend to all essential elements or terms for a contract to be binding." *Troutwine Ests. Dev. Co., LLC v. Comsub Design & Eng'g, Inc.*, 854 N.E.2d 890, 897 (Ind. Ct. App. 2006). "The intent relevant in contract matters is not the parties' subjective intents but their outward manifestation of it." *Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005). "A court does not examine the hidden intentions secreted in the heart of a person; rather it should examine the final expression found in conduct." *Id.*

"To be valid and enforceable, a contract must be reasonably definite and certain." *Conwell*, 906 N.E.2d at 812-13 (Ind. 2009). "All that is required to render a contract enforceable is reasonable certainty in the terms and conditions of the promises made, including by whom and to whom; absolute certainty in all terms is not required." *Id.* "Only essential terms are necessary for a contract to be enforceable." *Jetz*, 165 N.E.3d at 995. "If a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning." *Jernas v. Gumz,* 53 N.E.3d 434, 444 (Ind. Ct. App. 2016). "A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms." *Id.* "A contract is not ambiguous merely because the parties disagree as to its proper construction." *Id.*

A court may order specific performance of a settlement agreement. *Jetz,* 165 N.E.3d at 994. "The grant of specific performance directs the performance of a contract according to, or substantially in accordance with, the precise terms agreed upon." *Kesler v. Marshall*, 792

11

N.E.2d 893, 896 (Ind. Ct. App. 2003). The decision whether to order specific performance is a matter of the trial court's discretion, "but is governed by and must conform to the well-settled rules of equity." *Id.* Specific performance should generally not be ordered when an adequate remedy at law exists. *Id*. at 897. "[A] party seeking specific performance 'must prove that he has substantially performed his contract obligations or offered to do so.'" *SCI Indiana Funeral Servs., Inc. v. D.O. McComb & Sons, Inc*., 820 N.E.2d 700, 707 (Ind. Ct. App. 2005) (quoting *Kesler*, 792 N.E.2d at 896).

NeurOptics does not argue that the email exchange between the CEOs lacked an offer, acceptance, or consideration, but instead argues that there was no meeting of the minds regarding the covenant not to sue. [*See* Filing No. 72.] Specifically, NeurOptics argues that it believed it was agreeing not to sue Brightlamp in connection with a "family" of specific patents, while Brightlamp believed NeurOptics was agreeing not to sue based on any of its pupillometer patents, and because of these differing beliefs, no contract was ever formed. As noted above, regardless of what the parties subjectively believed, it is their objective manifestation of intent that controls. *See Zimmerman*, 826 N.E.2d at 77. None of the evidence presented supports NeurOptics' contention that the parties had differing intentions regarding the covenant not to sue during the discussions leading up to the July 24, 2020 email agreement.

As an initial matter, the phrase "NeurOptics' pupillometer patent portfolio" is not ambiguous. The Oxford English Dictionary defines "portfolio" as "[a] range of products, services, assets, or qualities offered or possessed." *Portfolio*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/148175?redirectedFrom=portfolio#eid (last visited Sept. 16, 2021). This definition reflects a commonsense understanding of the meaning of that term. The phrase "NeurOptics' pupillometer patent portfolio" simply means the range or collection of

pupillometer patents possessed by NeurOptics. "Pupillometer patents," as ordinarily understood, means patents for pupillometer devices and technology, subject to the field of use restriction listed in Paragraph 1 of the settlement agreement.[2] The fact that the parties have competing interpretations of this provision does not render it ambiguous. *See Jernas*, 53 N.E.3d at 444.

This definition is also supported by NeurOptics' conduct, through its counsel, Mr. Dilger. Mr. Dilger first referenced the concept of NeurOptics' portfolio of pupillometer patents in the March 2019 demand letter. In that letter, Mr. Dilger repeatedly referenced NeurOptics' extensive "portfolio" of patents relating to pupillometers. Mr. Dilger is also the person who included the phrase "NeurOptics' pupillometer patent portfolio" in NeurOptics' initial settlement demand, without limiting that phrase in any way now suggested by NeurOptics. Nothing in the parties' correspondence leading up to the email exchange between the CEOs objectively evidences any intention to limit the phrase to be narrower than how it had previously been used by Mr. Dilger.

This interpretation is also supported by looking to the other provisions of the email agreement. *See John M. Abbott, LLC v. Lake City Bank*, 14 N.E.3d 53, 56 (Ind. Ct. App. 2014) ("If necessary, the text of a disputed provision may be understood by referring to other provisions within the four corners of the document."). Paragraph 1 of the agreement expressly limited Brightlamp's promise not to market or sell the Reflex application to hospitals "up to the expiration *of the patents-in-suit* (i.e. August 1, 2021)." [Filing No. 72-5 at 3 (emphasis added).] However, the covenant not to sue contains no such limitation, suggesting that no limitation was intended.

---

[2] The Court observes that the definition proposed by Brightlamp during the exchanging of drafts of formalized versions of the parties' agreement—"any and all patents owned by NeurOptics . . . that cover pupilometer products or components thereof, or the Accused Products"—is overly broad to the extent it included patents for components of pupillometers, rather than pupillometers themselves.

13

The parties' conduct also exhibited an intent to be bound. *See Sands*, 945 N.E.2d at 180 ("To determine whether a contract is enforceable, there are two interrelated areas that must be considered: 'intent to be bound and definiteness of term.'"). Mr. Sluss directed Mr. Worthen to notify counsel of the agreement, Mr. Worthen did so, and the parties notified the Court the same day that a settlement had been reached.

Although NeurOptics repeatedly asserts that it would not have agreed to a covenant not to sue covering all of its pupillometer patents, considering the objective evidence of its intent resulting in an unambiguous provision, that is precisely what it did. The competing definitions offered by the parties after a contract had been formed by the CEOs' email exchange, in an attempt to agree on documents to be filed with the Court, does not change the fact that the parties' conduct before and culminating in the email exchange showed a sufficient meeting of the minds to form an enforceable contract. In other words, that the parties' desires may have evolved or differed post-contract is largely irrelevant to the Court's conclusion that a valid and binding settlement agreement was reached. *See Sands*, 945 N.E.2d at 181 (rejecting the argument that settlement agreement could not be enforced before the execution of formal documents because "executing the motions to dismiss and the releases would constitute the full performance of the contract, not its formation").

Moreover, an order of specific performance is appropriate in this instance. Brightlamp is prepared to immediately make the required payment, [Filing No. 70-1 at 3], and as evidenced by the present motion, has made an effort to dismiss its counterclaims as contemplated by the agreement. NeurOptics has not alleged that Brightlamp has not complied with any other provision of the agreement.

"A court will not find that a contract is so uncertain as to preclude specific enforcement where a reasonable and logical interpretation will render the contract valid." *Conwell*, 906 N.E.2d at 813. That is the case here, as a reasonable and logical interpretation of the covenant not to sue, supported by the parties' objective manifestations of their intent, demonstrates mutual assent and the existence of a valid contract to settle this case. Brightlamp's motion is therefore **GRANTED**.

## IV.
### CONCLUSION

Based on the foregoing, Brightlamp's Renewed Motion to Enforce Settlement Agreement and Dismiss this Action, [69], is **GRANTED**. The settlement agreement reached between the parties on July 24, 2020 is binding and enforceable. Pursuant to that agreement, the Court **ORDERS** Brightlamp to deliver $3,000 to NeurOptics and notify the Court of such delivery within **14 days** of this Order. Once the Court receives that notification, it will dismiss this action, including all claims and counterclaims, with prejudice in accordance with the parties' agreement, with both parties to bear their own fees and costs. All other terms of the settlement agreement shall take effect without further action by the Court.

Date: 9/16/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**